[No. 204-2. Division Two. February 17, 1971.]

GEORGE E. DUCHSHERER, *Respondent,* v. NORTHERN PACIFIC RAILWAY COMPANY, *Appellant.*

*Roger J. Crosby* and *Delbert W. Johnson,* for appellant.

*Huntington & Borders* and *Ronald Huntington* (*Reiter, Day, Wall & Bricker, Glenn H. Prohaska,* and *Monte Bricker,* of counsel), for respondent.

PEARSON, J.—Defendant, Northern Pacific Railway Company, appeals from a judgment entered on a jury verdict in favor of the plaintiff in an action seeking damages for personal injuries. Plaintiff cross-appeals from an order of remittitur in which the trial court reduced the jury verdict from $100,000 to $60,000 or, in the alternative, granted a new trial.

At the time of this accident, plaintiff George E. Duchsherer, was a section foreman for the Northern Pacific, based at Wymer, in Yakima County. As part of his duties, plaintiff occasionally had to make a journey to Selah to replenish supplies of gasoline and lubricants. On the date of the accident, plaintiff and two of his crew members had loaded two push cars (essentially a small flatcar without means of self-propulsion) with 13 empty, 55-gallon drums and had coupled these push cars to the A-3 motorcar the railroad had provided them. The A-3 motorcar is a self-propelled, 1-ton vehicle, designed both to carry people to their work and, when coupled with the push cars, to pull around loads of material those people might need in their work.

After traveling for some time down the mainline of the Northern Pacific, which at this place consisted of straight, level, ribbon track (that is, track with the joints welded to form ribbons up to ¼ mile long) the motorcar suddenly rolled over on its top, causing plaintiff severe, permanent injury to his neck and shoulders. The cause of this un-

fortunate mishap was not clear, but the evidence pointed to a device, called a turntable, having broken off the front of the motorcar and having fallen in the path of the wheels, causing the car to overturn. The plaintiff testified that he heard steel strike steel just before the overturning. A railway investigator testified that marks on the ties and the position of the wreckage indicated to him that the turntable came loose. This turntable is a device constructed by the railroad so that its section crews, which have been reduced in size in recent years, might more readily move the motorcar on and off the tracks.

Plaintiff's complaint alleged two causes of action. The first cause of action claimed under the Locomotive Inspection Act (45 U.S.C.A. § 22 et seq. (1954)), and the second claimed under the Federal Employers Liability Act (45 U.S.C.A. § 51 et seq. (1954)).

The trial court separated its instructions to the jury into two groups, relating to the two causes of action. The court first considered the cause of action brought under the Locomotive Inspection Act. After completing instruction on this phase of the case, the court told the jury that they were to deliberate upon this cause and if they did not find liability under it, they were then to consider the second portion of the instruction relating to the F.E.L.A. In this second portion of the instructions, the jury was directed to answer two special interrogatories if their verdict was under the F.E.L.A. Since the jurors are presumed to follow the instructions of the court, and since no answers were given to the special interrogatories, we assume the jury determined defendant's liability under the Locomotive Inspection Act. We will thus consider the assignments of error relating to that cause.

 The first question defendant raises is whether or not the A-3 motorcar is a locomotive for purposes of the Locomotive Inspection Act. The trial court instructed the jury that the A-3 motorcar was a locomotive for purposes of the statute and the defendant excepted both to the giving of this instruction and to the failure to instruct that

the motorcar was not a locomotive. Both parties agree that this is a question of federal law. Under the federal law, we believe that the A-3 motorcar is a locomotive for purposes of the statute and that the trial judge was correct in so deciding.

As an initial proposition, we note that federal railroad legislation, including the Locomotive Inspection Act, has the humanitarian purpose of protecting workers and other persons from harm caused by defective railroad equipment. In view of this purpose, it ought to be construed liberally, so as to afford maximum protection for life and limb. *Lilly v. Grand Trunk Western R.R.*, 317 U.S. 481, 87 L. Ed. 411, 63 S. Ct. 347 (1943); *Urie v. Thompson*, 337 U.S. 163, 93 L. Ed. 1282, 69 S. Ct. 1018 (1949). In a case involving a motorcar pulling a push car on the tracks of the Baltimore & Ohio Railroad, the United States Supreme Court found that the Safety Appliances Acts (45 U.S.C.A. § 1 *et seq.* (1954)) applied to motorcars when the motorcar was in use as if it were a locomotive. That is, where the motorcar is being used to carry people or pull cargo on the railroad's track, it is being used like a locomotive and it will be treated as such, and consequently is subject to provisions of the law designed to protect persons from harm. *Baltimore & Ohio Ry. v. Jackson*, 353 U.S. 325, 1 L. Ed. 2d 862, 77 S. Ct. 842 (1957).

We acknowledge that a Caterpillar tractor used to pull cars around a railroad yard has been held not to be a locomotive for purposes of the federal statutes, *Mazzucola v. Pennsylvania R.R.*, 281 F.2d 267 (3d Cir. 1960) but even in that case, the court pointed out that it was excluding a thing that did not run on rails, but rather on its own tractor treads. The court recognized that a motorcar used to pull push cars down the track had been held within the act, but stated it would not go beyond that holding to further expand coverage of the federal statutes.

We also note that the Interstate Commerce Commission, with its particular expertise in the area of railroad regulation, follows a similar functional definition of locomotive.

297 ICC 177, 190 (1955). After the *Baltimore & Ohio Ry. v. Jackson* decision, the commission prescribed rules to be followed in the case of motorcars used as locomotives, and push cars used like more conventional freight or passenger cars. In this rule making, the commission again accepted the sort of functional definition urged by the plaintiff in the trial court and here. 325 ICC 722 (1965).

Federal policy favors liberal protection of persons from harm in railroad accidents. Various acts have been construed together where necessary, to achieve this end. *Urie v. Thompson, supra.*

We think that in this case the motorcar in question was being used as a locomotive and that the Locomotive Inspection Act was applicable as a matter of law.

Did the trial court properly instruct the jury under the Locomotive Inspection Act? Defendant's assignments of error on this branch of the case resolve themselves into three major categories: (1) failure to properly instruct on burden of proof; (2) failure to properly define the causal connection necessary between the violation of the statute and the injury to plaintiff; and (3) failure to properly define the defendant's duty under the statute.

■ Defendant's contentions regarding burden of proof are without merit. The trial court instructed the jury that where the following words were used—"burden of proof" or "preponderance" or "fair preponderance of the evidence" or "if you decide" or "if you find"—they were to consider all the evidence in the case and be persuaded that the proposition in question was more probably true than not true. In the balance of the instructions, the trial court several times used the expression "if you find" in regard to propositions, the proof of which was necessary to plaintiff's case. The words "burden of proof" are not wrapped in some semantic magic that necessitates their invocation in order to have legally sufficient instructions and we do not deem the failure to define that word as such constituted error. *See State v. Redden,* 71 Wn.2d 147, 426 P.2d 854 (1967). When we read the instructions given in this case,

we find an admirably clear exposition of the propositions the trial court felt were conditions precedent to plaintiff's recovery under the Locomotive Inspection Act. The requirement that the jury must be told the prerequisites of liability, *see State v. Carter*, 4 Wn. App. 103, 480 P.2d 794 (1971), was more than adequately met here.

This leaves us with defendant's other two major categories of error, which test the sufficiency of the propositions the trial court set out as requisites for recovery. The first of these alleged difficulties relates to the trial court's lack of a specific definition of the necessary causal connection between a violation of the statute and the injury.[1]

■ We first note that the Locomotive Inspection Act is a strict liability statute, not based on the common law tort concept of negligence. That is, violation of the Locomotive Inspection Act imposes strict liability without regard to contributory fault. *Lilly v. Grand Trunk Western R.R., supra;* 2 W. Schneider, Workmen's Compensation Law § 276 (3d ed. 1942). The older common law concept of proximate cause is not applicable in its full rigor to this statutory scheme. Rather, the courts, being mindful of the benevolent purposes of the statute, look to whether the statutory violation contributed in some way to the injury of plaintiff and upon finding such a connection, impose liability. *Page v. St. Louis Southwestern Ry.*, 349 F.2d 820 (5th Cir. 1965); *Rogers v. Missouri Pac. R.R.*, 352 U.S. 500, 1 L. Ed. 2d 493, 77 S. Ct. 443 (1957). In the law of our own state, we

---

[1] In this regard instructions No. 5, 7, 9, and 11 all provided some definition of this causal connection. In instruction 9 the jury was told contributory negligence is no defense under the Locomotive Inspection Act and that to find liability under that act, the jury had to find that there was a "violation of the Locomotive Inspection Act which contributed to cause . . . the injuries" of the plaintiff. Instruction 5 uses the language, "that plaintiff suffered his injuries as the result of a defective or inefficient motor car, . . . ". Instruction 7 says that the violation of the law, if any, must have "contributed in some way or manner to plaintiff's injury." Finally, instruction 11 says that the railroad is liable if "the violation contributed in any way or manner to the injury of the plaintiff, . . . ". We think this language is sufficient to apprise the jury that there is a necessary causal connection between the violation of a duty by the railroad and the injury.

think that the rule of Restatement (Second) of Torts § 402 A (1966), and *Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 452 P.2d 729 (1969) better fit the requirements of a statute like the Locomotive Inspection Act than do more ordinary tort concepts.

When we consider the language employed by the trial court in this case, we find that the jury was adequately informed that to allow a recovery for plaintiff, they had to find causal connection between a statutory violation and plaintiff's injury. The instructions were not inconsistent and when read, giving the words their ordinary meaning, were sufficient to communicate to the jury the legal requisites of recovery.

Defendant's third proposition—that the railroad's duty was not properly defined—is also without merit.

■ Defendant is under the statutory duty to operate only locomotives "and all parts and *appurtenances* thereof [which] are in proper condition and safe to operate[2] in the service to which the same are put, . . . ". (Italics ours.) 45 U.S.C.A. § 23 (1954). This duty has been liberally construed. It seems clear that the turntable in this case is an appurtenance to the motorcar. *See Southern Ry. v. Bryan,* 375 F.2d 155 (5th Cir. 1967), *cert. denied,* 389 U.S. 827, 19 L. Ed. 2d 83, 88 S. Ct. 82 (1967), wherein a bracket used to lift a derailed locomotive back to the rails was found to be an appurtenance. The turntable is equipment issued by the railroad for use with the A-3 motorcar. It was apparently in service widely for an extended period of time. We think that where the railroad issues a device for use with a particular sort of motorcar, and this device is

---

[2]In instruction 6 the jury was told:
"The Locomotive Inspection Act provides:
" 'It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time . . .' ."

widely and routinely used in the operation of the motorcar, that device becomes an appurtenance to the motorcar, for purposes of the Locomotive Inspection Act. The turntable can hardly be called an experimental device. Its use is routine; it can hardly be considered emergency equipment. *See Southern Ry. v. Lunsford,* 297 U.S. 398, 80 L. Ed. 740, 56 S. Ct. 504 (1936). While long and safe service may indicate that the turntable is in general a safe device, we think that the failure of one of these devices to remain in the position in which it is normally transported, due to a failure either in itself or of the structure of the motorcar would entitle the jury here to find a violation of the Locomotive Inspection Act. If a failure of the turntable itself caused it to fall in front of the motorcar's wheels, then the turntable was an unsafe appurtenance. If it was a structural failure of the motorcar which caused the turntable to fall— which seems the more likely hypothesis under the evidence —then those parts or appurtenances which failed and led to the accident would seem to be defective. Whichever view of the evidence was taken by the jury, they could properly find liability for violation of the Locomotive Inspection Act on the basis of the instructions given by the trial court.

■ Defendant has urged two evidentiary rulings as the basis for a new trial. These were the admission of the testimony of one expert witness and the rejection of the testimony of another. We can find no abuse of the trial court's discretion in those evidentiary rulings. The testimony that was admitted came from a railroad accident investigator dispatched to investigate this particular accident. He testified that part of his job was to conduct such investigations and that he had done so for at least 12 years. Testimony indicated that he was familiar with the area of the accident and with the operation and operating characteristics of the equipment involved in the accident. We think that the trial court was entitled to allow opinion evidence from this witness as to the cause of the accident. *Palmer v. Massey-*

*Ferguson, Inc.*, 3 Wn. App. 508, 476 P.2d 713 (1970); *Parris v. Johnson*, 3 Wn. App. 853, 479 P.2d 91 (1970).

The excluded testimony was also to have been an opinion as to the cause of the accident, according to defendant's offer of proof. This opinion was to have come from a track supervisor who testified he had no experience investigating accidents. He had often driven motorcars of this kind and had driven past the scene of the accident not long before it occurred and noticed nothing out of the ordinary. Admission of this testimony would have been somewhat like allowing an experienced automobile driver, without other qualifications, to express an opinion on the cause of an automobile accident. We think this witness' lack of expert skill justified the trial court in excluding his opinion testimony. *Palmer v. Massey-Ferguson, Inc., supra.*

This brings us to the final point raised by respondent's cross-appeal—whether the remittitur was properly granted in this case. The trial court gave three reasons for granting the remittitur: (1) the failure of the jury to recognize the value of money; (2) the pitiful appearance of the plaintiff, in part due to a preexisting arthritic condition; and (3) the admission of evidence concerning the physical circumstances in which plaintiff lived at the time of his injury. We must consider whether or not these reasons are sufficient to justify the trial court's action.

According to RCW 4.76.030 the verdict of the jury is presumed to be correct unless the award is so excessive or inadequate as to unmistakably indicate it must have been the result of passion or prejudice. As the Supreme Court has pointed out, the determination of damages is peculiarly within the province of the jury. Though philosophic debate on the utility of juries as fact finders and damage assessors can be and often is engaged in, if it is assumed that the jury is the proper organ to assess damages, then its determinations should stand unless the amount assessed so exceeds rational bounds as to unerringly point to a genesis in passion, rather than in fact. *Baxter v. Greyhound Corp.*, 65 Wn.2d 421, 397 P.2d 857 (1964); *Cox v. Charles Wright*

*Academy,* 70 Wn.2d 173, 422 P.2d 515 (1967); *Johnson v. Marshall Field & Co.,* 78 Wn.2d 609, 478 P.2d 735 (1971).

When we examine this record, we find testimony disclosing that plaintiff, 45 years of age, will live the rest of his life in constant pain. His injuries were severe and permanent in nature. Though he had a preexisting condition, the evidence, including that testimony which the trial court assigned as one of the grounds for granting the remittitur, disclosed that the accident left the plaintiff not only with constant pain, but also with a drastically limited ability to engage in physical labor. After the accident, the plaintiff, according to the testimony the trial court assigns as objectionable, was unable to perform tasks which his living conditions required someone in the household to do. These tasks included hauling ice, starting a gasoline engine on the washing machine, and for a considerable time even approaching his home over the suspension bridge that was the only access. In addition, though he was still able to supervise his crew, the plaintiff could no longer engage in assisting his men with heavy physical labor as is the practice on section crews. This evidence all went to show the extent of plaintiff's injuries by showing what plaintiff could do before, but could not do after the accident. We think this relevant evidence was properly admitted. *See Chase v. Beard,* 55 Wn.2d 58, 346 P.2d 315 (1959).

We are unready to believe that the jurors in this case did not know the value of the money they awarded to plaintiff. The Supreme Court refused to make this assumption in *Baxter* and we refuse to make it here. As for the plaintiff's pitiful appearance, any influence this might have had on the minds of jurors could be prevented only by excluding the plaintiff from the trial. Such restriction we hold to be wholly unwarranted. The jurors were instructed that passion and prejudice were not to influence their deliberations. When we examine the whole record, we find that the trial judge fairly conducted the proceedings, adequately instructed the jury, and properly sent them to their deliberations. We cannot say that the result reached by the jury

transcends the bounds of reasonable recovery for the injuries sustained. Since we cannot say that the amount of the verdict unmistakably points to its having been arrived at by passion and prejudice, rather than by reason, the remittitur was unwarranted.

The judgment will be affirmed, but modified to reinstate the verdict of the jury.

PETRIE, C.J., and ARMSTRONG, J., concur.
Petition for rehearing denied March 15, 1971.
Review denied by Supreme Court May 6, 1971.