[No. 20931-8-III. Division Three. August 19, 2003.]

TAY CONRAD, *as Personal Representative*, ET AL., *Respondents*, v. ALDERWOOD MANOR, ET AL., *Appellants*.

276

278

*Russell C. Love* (of *Thorsrud, Cane & Paulich, Inc., P.S.*) (*Edward M. Kay* and *Melinda S. Krollross* of *Clausen, Miller*, of counsel), for appellants.

*Mark D. Kamitomo* and *Shane D. McFetridge* (of *The Markam Group, Inc., P.S.*), for respondents.

*Jeff B. Crollard* on behalf of Washington State Long-Term Care Ombudsman Program, amicus curiae.

SWEENEY, J. — This is a claim for injuries to and the death of an elderly nursing home patient. The claim resulted in a multimillion dollar jury verdict. On appeal the nursing home challenges the sufficiency of the evidence to support liability for one of the injuries—a femur fracture—to the patient. We conclude that the evidence is sufficient to support liability. The nursing home also challenges the damage award and the court's special verdict form, which, it claims, accommodated an improper award of double damages. But the nursing home took no exception to the verdict form at trial and therefore waived any right to challenge the form of the verdict on appeal. Finally, the nursing home challenges the size of the verdict here as punitive or undeniably the product of passion and prejudice. We cannot say that it is. And we therefore affirm the judgment entered on the jury's verdict.

## FACTS

Enid Conrad was 91 years old when she suffered a debilitating stroke in February 2000. Her family placed her in Alderwood Manor, a Spokane nursing home. While in Alderwood, Enid suffered a femur fracture on June 10. Thereafter the break compounded severely, requiring amputation of her lower leg. Exactly how and why her leg fractured was vigorously contested at trial. Evidence showed that Alderwood failed to properly monitor the fracture and did not discover the compounding for two days. A few months later, Enid fell from her wheelchair and fractured her neck after an Alderwood aide forgot to replace the armrest. The hard cervical collar required to treat that injury caused skin ulcerations. Enid died of pneumonia seven months later, on April 23, 2001.

Tay Conrad, as personal representative of the estate of his mother Enid Conrad, and his father Wafford Conrad

(Conrad) sued Alderwood Manor, Consolidated Resources Health Care Fund One LP, and Life Care Centers of America (Alderwood), setting out causes of action in common law negligence and neglect under the abuse of vulnerable adults statute (RCW 74.34.200). A jury found liability against Alderwood for both negligence and neglect and awarded Conrad $4.755 million.

Alderwood moved for a new trial on a number of grounds pertinent to this appeal. First, it argued that Conrad had failed to prove that Alderwood's conduct was responsible for Enid's broken femur (an injury which directly and indirectly resulted in other injuries). Next, it argued that the court's special verdict form (one it did not object to) allowed the jury to award a double recovery. And, finally, it objected to the sheer size of the award based on a number of legal theories. The trial court ultimately denied the motion and entered judgment on the verdict. The court also entered an order granting Conrad $239,063.00 in attorney fees and $39,781.80 in costs under the abuse of vulnerable adults statute (RCW 74.34.200(3)).

## DISCUSSION

### SUBSTANTIAL EVIDENCE THAT ALDERWOOD PROXIMATELY CAUSED ENID'S FEMUR FRACTURE

*Contentions.* Alderwood begins by noting what is obvious from this record. There is no direct evidence of the cause of Enid's initial femur fracture. It continues that even the circumstantial evidence presents only alternate *possibilities*. And from this it urges that the jury's finding of causation is then just speculation. *Sanchez v. Haddix*, 95 Wn.2d 593, 599, 627 P.2d 1312 (1981); *O'Donoghue v. Riggs*, 73 Wn.2d 814, 824-25, 440 P.2d 823 (1968). Alderwood then concludes all damage claims must be retried because the femur fracture for which it is not responsible was a proximate cause of Enid's death, and the damage awards for her other injuries and death are all intertwined.

Conrad responds that Enid's spiral leg fracture was not the result of osteoporosis. And it could have occurred only by a rotational mechanism or twisting force, more probably than not the result of someone catching her leg in the bed rails or dropping her on the floor.

The issue all of this frames is simply whether the circumstantial evidence here is sufficient to support liability against Alderwood for Enid's broken leg.

■ *Standards of Review.* A trial court should grant a motion for a judgment as a matter of law when, viewing the evidence most favorable to the nonmoving party, the court can conclude as a matter of law that there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party. *Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.-2d 907, 915, 32 P.3d 250 (2001). The evidence must be " 'sufficient to persuade a fair-minded, rational person of the truth of the declared premise.' " *Id.* (quoting *Brown v. Superior Underwriters*, 30 Wn. App. 303, 306, 632 P.2d 887 (1980)). When reviewing a judgment as a matter of law, we apply the same standard as the trial court. *Id.*

■ *Proximate Cause.* Proximate cause is generally a question of fact. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). Proximate cause has two elements—cause in fact (but-for cause) and legal causation (legal policy). *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998). "A proximate cause is one that in natural and continuous sequence, unbroken by an independent cause, produces the injury complained of and without which the ultimate injury would not have occurred." *Attwood v. Albertson's Food Ctrs., Inc.*, 92 Wn. App. 326, 330, 966 P.2d 351 (1998) (citing *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 935, 653 P.2d 280 (1982)). The plaintiff need not establish causation by direct and positive evidence. She need only show by "a chain of circumstances from which the ultimate fact required is reasonably and naturally inferable." *Attwood*, 92 Wn. App. at 331 (citing *Teig v. St. John's Hosp.*, 63 Wn.2d 369, 381, 387 P.2d 527 (1963)).

But evidence establishing proximate cause must rise above speculation, conjecture, or mere possibility. *Reese v. Stroh*, 128 Wn.2d 300, 309, 907 P.2d 282 (1995). A jury is not permitted to speculate on how an accident or injury occurred when causation is based solely on circumstantial evidence and there is nothing more substantial to proceed on than competing theories with the defendant liable under one but not the other. *Sanchez*, 95 Wn.2d at 599; *Jankelson v. Sisters of Charity*, 17 Wn.2d 631, 643, 136 P.2d 720 (1943).

■ To remove medical issues from the realm of speculation, the medical testimony must demonstrate that the alleged negligence "probably" or "more likely than not" caused the harmful condition leading to the injury. *O'Donoghue*, 73 Wn.2d at 824. It is not enough that the defendant's conduct "might have" or "possibly did" cause the injury. *Id.*; *see also Attwood*, 92 Wn. App. at 331.

*Circumstantial Evidence.* There was no direct evidence here on just how Enid's femur fractured. We review the facts in some detail because this is essentially a factual dispute.

Enid did have osteoporosis. But board certified orthopedic surgeon Dr. Jonathan Knight testified that, based upon the strength of Enid's bone, her spiral femur fracture could have occurred only by a rotational mechanism or twisting force, the equivalent of breaking a frozen lug nut loose with a tire iron. Dr. Knight specializes in artificial hip and knee surgery. This involves cutting into bone. He concluded that her fracture probably occurred by someone catching her leg in the bed rails or dropping her on the floor during a transfer.

Conrad's nursing home standard of care expert, Dixie Carman, agreed. She testified according to medical records that prior to June 10, Enid could no longer bear weight on her feet and legs and was unable to turn herself or move about in bed. Ms. Carman testified that catching Enid's leg in the bed rail or bed sheets or dropping her during a transfer were the only nursing home situations she was

aware of that would cause the leg to twist when transferring a patient. And Ms. Carman concluded that any of these would constitute a breach of the standard of care by a nursing home.

She also testified that Alderwood failed to follow its own policy when it failed to investigate the cause of the fracture. The Department of Social and Health Services (DSHS) cited Alderwood for failure to appropriately investigate the circumstances surrounding the fracture and subsequent compounding.

Alderwood argues that there was no showing that Enid was moved or dropped by anyone from Alderwood just prior to her injury. And moreover, her husband Wafford spent the evening with her in the dining hall and wheeled her back to the room himself. The injury was then discovered within five minutes by nursing assistant Kim White, who was then alone with Enid. And Enid was still seated in her wheelchair. Alderwood also points out that no one testified that Enid was in any pain prior to that time. And there was no evidence that Alderwood's staff earlier caused the fracture. And Alderwood nurse Yvonne Sarazin testified that Wafford admitted a couple of days later that he had recently repositioned Enid's legs and asked if he could have caused the fracture.

But no one witnessed Wafford do anything that could have caused the fracture. And no one testified that Enid had previously been in any pain associated with her left femur. Wafford is a retired newspaper reporter. He keeps daily diary notes. He testified based on those notes that on the evening of June 10, he and Enid were in the restorative dining hall where he fed her. She "downed everything except a little of her milk." Report of Proceedings (RP) at 527. They watched Lawrence Welk on television before he wheeled her back to her room for the night nurses to take over. He then went home and was summoned to the emergency room at about 9:00 P.M. There he saw Enid crying out in pain from the femur fracture. Wafford denied ever moving Enid's legs. And he said he absolutely had

nothing to do with fracturing her leg on June 10. His credibility versus that of Nurse Sarazin was a matter for the jury. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 108, 864 P.2d 937 (1994).

Alderwood next points to the testimony of Enid's daughter, Joy Conrad, as presenting the more likely scenario that the fracture was caused by Enid's foot falling off the wheelchair footrest and dragging on the ground. Ms. Conrad testified that, prior to June 10 when the family pushed Enid in her wheelchair, often one or both feet would slip between the footrests and drag on the floor. Enid would wince in pain and Alderwood staff would help readjust the footrests. Alderwood's medical expert, Dr. Robert Cook, testified that minimal trauma from her feet dragging could have caused the femur fracture.

But Joy Conrad also testified she was not in Spokane and thus not around her mother from May 1 through June 9, 2000. And Tay Conrad testified that with the help of Alderwood staff, the wheelchair problem was fixed after April and after that he did not see Enid's feet fall from the footrests. No one testified that Enid's left foot dragged under the wheelchair on June 10 or, for that matter, anytime in May or June. Dr. Cook conceded on cross-examination that the foot dragging could not be a cause of the fracture if there is no evidence the leg ever fell off the wheelchair from May to June 10, 2000.

Alderwood also relies on Dr. Cook's testimony that Enid's bones were so weak the spiral fracture could have occurred in any number of ways. Dr. Cook explained the direct correlation between osteoporosis and bone fragility. But Dr. Knight earlier testified the June 10 fracture did not result from osteoporosis. He said Enid's skeleton and mineral content of her bones was healthy. She snowshoed within two years of the fracture. And she swam within a year of being placed in Alderwood. Dr. Knight said that if oak is the strongest piece of wood on a spectrum and balsa is the weakest, Enid's bone would be the strength of pine. He concluded that the strength of Enid's bone was not such that it could break by itself or due to minimal trauma

associated with sneezing or by turning over in bed with a sheet wrapped around the ankles. He did not think that in a two- or three-year time frame it would be possible for her to go from a healthy skeleton to one that would just shatter with the slightest movement of her legs. Dr. Knight also testified the presence of hardware from prior surgeries formed a strong composite on the bone extremities on either side of the fracture and had no contributing effect to the fracture.

And Alderwood's expert, Dr. Cook, ultimately conceded that the femur fracture (and subsequent compounding) could have occurred by negligence.

When there could be more than one cause of an injury, the testimony, whether direct or circumstantial, must reasonably exclude every hypothesis other than the one relied on. *O'Donoghue*, 73 Wn.2d at 824. Conrad has done so here. They provided substantial evidence from which the jury could reject Alderwood's alternate cause scenarios. *Burnside*, 123 Wn.2d at 108. The jury had, then, adequate circumstantial evidence from which to reasonably infer that the June 10 fracture was caused by Alderwood's negligence. *See also Almquist v. Finley Sch. Dist. No. 53*, 114 Wn. App. 395, 407, 57 P.3d 1191 (2002).

The cause of the fracture was unexplained by any direct evidence. And Alderwood failed to conduct the legally required investigation. Ms. White was a one-on-one caregiver for Enid. And she had had significant prior criminal problems. Alderwood's sole investigative-type record entry was made by Nurse Sarazin three days after the injury. In it Wafford worried that he may have caused the fracture. But he was also assured Enid's bones were so brittle that any movement could have caused the injury. But coupling Wafford's denial that he made the statement with medical testimony that Enid's bones were not that brittle, the jury surely could reject Alderwood's record entry as self-serving. And the jury would then be left with no credible investigation of an injury suffered by one of Alderwood's vulnerable residents.

In these circumstances, Alderwood's additional contention that its investigative shortcomings and the resultant citation are irrelevant to the various cause scenarios is misplaced. Alderwood's contention would, in effect, reward it for lack of investigation and hinder pursuit of claims by impaired nursing home residents.

The trial judge did not err in denying Alderwood's motion for judgment as a matter of law on the question of proximate cause for the femur fracture.

SPECIAL VERDICT FORM ALLOWED AN IMPROPER AWARD OF DOUBLE DAMAGES

The special verdict form reads:

We, the jury, make the following answers to the questions submitted by the court:

QUESTION NO. 1: Was the defendant negligent with respect to any of the following:

Answer "yes" or "no".

| | | |
|---|---|---|
| The broken leg: | Yes: X | No: _____ |
| The compound fracture: | Yes: X | No: _____ |
| The broken neck: | Yes: X | No: _____ |

QUESTION NO. 2: Was such negligence a proximate cause of damage to the plaintiffs with respect to any of the following:

Answer "yes" or "no".

| | | |
|---|---|---|
| The broken leg: | Yes: X | No: _____ |
| The compound fracture: | Yes: X | No: _____ |
| The amputation: | Yes: X | No: _____ |
| The broken neck: | Yes: X | No: _____ |
| Plaintiff's Death: | Yes: X | No. _____ |

If your answer was "no" to Question No. 2 with respect to all, then go to question No. 4. If your answer was "yes" to any, then answer Question No. 3.

QUESTION NO. 3: What do you find to be the plaintiff's amount of damages?

Wafford Conrad

Answer: Loss of Consortium: $ 85,000

Estate of Enid Conrad

| Answer: | Past Medical Care and Services: | $ 65,848.82 |
|---------|-------------------------------|-------------|
| | Broken Leg: | $ 10,000 |
| | Compound Fracture: | $ 60,000 |
| | Amputation: | $ 100,000 |
| | Broken Neck: | $ 500,000 |
| | Wrongful Death: | $ 75,000 |
| | Pain and Suffering: | $1,000,000 |

QUESTION NO. 4: Did defendant engage in an act or omission that demonstrated a serious disregard of the consequences of such a magnitude as to constitute a clear and present danger to Enid Conrad's health, welfare or safety?

Answer "yes" or "no" after the name of the defendant.

Alderwood Manor Yes: _X_ No: _____

If your answer was "no" to Question No. 4, then go to question No. 6. If your answer was "yes" then answer Question No. 5.

QUESTION NO. 5: Was the act or omission a proximate cause of damage to the plaintiffs?

Answer "yes" or "no" after the name of the defendant found negligent by you in Question No. 4.

Alderwood Manor: Yes: _X_ No: _____

After answering question # 5, proceed to question # 6.

QUESTION NO. 6: Did defendant engage in a pattern of conduct or inaction which resulted in a deprivation of the goods and services that maintained Enid Conrad's physical or mental health, or which failed to avoid or prevent physical or mental harm or pain to Enid Conrad?

Answer "yes" or "no" after the name of the defendant

Alderwood Manor: Yes: _X_ No: _____

If your answer was "no" to Question No. 6 and "yes" to Question No. 5, then go to Question No. 8. If your answer was "yes" to Question No. 6, then answer Question No. 7.

QUESTION NO. 7: Was such conduct or inaction a proximate cause of damage to the plaintiffs?

Answer "yes" or "no" after the name of the defendant found negligent by you in Question No. 6.

Alderwood Manor: Yes: _X_ No: _____

If your answer was "no" to both Question No. 5 and Question No. 7, then sign and return this verdict. If your answer was "yes" to either Question No. 5 or Question No. 7, then go to Question No. 8.

QUESTION NO. 8: If you find that the damages in this question are the same as the ones in Question No. 3, then proceed to question # 9. If you find that they are different, calculate what you find to be the plaintiff's amount of damages and proceed to question # 9.

Estate of Enid Conrad

| Answer: | Broken Leg: | $ 25,000 |
| | Compound Fracture: | $ 500,000 |
| | Amputation: | $ 0 |
| | Broken Neck: | $ 500,000 |
| | Wrongful Death: | $ 85,000 |
| | Pain and Suffering: | $1,750,000 |

QUESTION NO. 9: Was the plaintiff, Wafford Conrad, also negligent?

Answer "Yes" or "No" Answer: _No_

Clerk's Papers at 231-34.

*Contentions.* Alderwood complains that the special verdict form allowed the jury to make a duplicate damage award. And even though it did not object to the form at trial, Alderwood argues that it can appeal, under CR 59(a)(7),[1] the double damage award or insufficiency of the evidence to

---

[1] The rule states:

"(a) **Grounds for New Trial or Reconsideration.** The verdict or other decision may be vacated and a new trial granted to all or any of the parties and on all or part of the issues when such issues are clearly and fairly separable and distinct, on the motion of the party aggrieved for any one of the following causes materially affecting the substantial rights of such parties:

". . . .

"(7) That there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law."

support duplicate awards for the same injuries. It also invites us to invoke inherent authority to consider issues not preserved below if necessary for a proper decision.

Conrad responds that this is not a double recovery. The special verdict form simply accommodates separate damage awards for separate causes of action, negligence and neglect. But even if the jury did award a duplicate recovery, Alderwood had to object to the verdict form before the verdict. And it failed to do so.

The question then is whether this assignment of error has been adequately preserved for appeal.

■ *Objection to Special Verdict Form.* We have just recently had occasion to pass on this question in a different context. *Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, L.L.P.*, 110 Wn. App. 412, 40 P.3d 1206 (2002). And there we concluded that a party must object to a verdict form, at trial, before the court instructs the jury:

> A lawyer must "state distinctly the matter to which he objects and the grounds of his objection" when objecting to the giving of any instruction. And this includes any special verdict forms. This gives the trial court a chance to change positions and thereby avoid the necessity of a second trial.
>
> The lawyer must offer a correct statement of the law to preserve the objection for appeal. We look at the objection and its context when passing on whether an objection is sufficient. And we do not consider statements made in a motion for new trial, on reconsideration, or on appeal.

*Id.* at 427 (citations omitted).

Here, Alderwood made no objection at trial to the special verdict form and offered no alternative form. It did not apprise the court of any concern about the potential for a double damage award. The assignment of error here is no different than any other point of law. To preserve an argument on appeal—here, that a verdict form improperly allowed for a double recovery—exception must be taken on that basis in the trial court. *Bingaman v. Grays Harbor Cmty. Hosp.*, 37 Wn. App. 825, 829, 685 P.2d 1090 (1984), *rev'd in part on other grounds*, 103 Wn.2d 831, 699 P.2d 1230 (1985).

This requirement is more than just an idle, legal technicality. The object in this process is to avoid trying a case twice. The trial judge must then be given the opportunity, in the first instance, to properly instruct the jury. *Trueax v. Ernst Home Ctr., Inc.,* 124 Wn.2d 334, 339, 878 P.2d 1208 (1994). So, if a lawyer thinks the court is about to commit error, he or she must speak up and allow the court to revisit the point at a time when the trial judge can do something about it. *See Lahmann v. Sisters of St. Francis,* 55 Wn. App. 716, 723, 780 P.2d 868 (1989).

Alderwood next attacks the very foundation upon which the instruction is based. And in that way it tries to save the assignment of error. It correctly cites case authority that a double damage award is contrary to Washington law.[2] Based on this, it claims that the verdict is contrary to law. And the court therefore abused its discretion by denying the motion for a new trial under CR 59(a)(7).

■■ We do review the challenge for abuse of discretion. A trial court abuses its discretion if a decision is manifestly unreasonable, or based upon untenable grounds or reasons. *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971); *see also In re Marriage of Scanlon,* 109 Wn. App. 167, 174, 34 P.3d 877 (2001), *review denied,* 147 Wn.2d 1026 (2002). On a CR 59(a)[3] motion a court may vacate for a claimed error of law other than one involving lack of substantial evidence only if the party objected at the

---

[2] *Seafirst Ctr. Ltd. P'ship v. Erickson,* 127 Wn.2d 355, 365, 898 P.2d 299 (1995) (the law does not sanction double recovery); *Eagle Point Condo. Owners Ass'n v. Coy,* 102 Wn. App. 697, 702, 9 P.3d 898 (2000) (basic principle of damages is that there shall be no double recovery for the same injury); *Barney v. Safeco Ins. Co.,* 73 Wn. App. 426, 428, 869 P.2d 1093 (1994) (applicable measure of damages is public policy with respect to recovery; double recovery violates public policy), *overruled on other grounds by Price v. Farmers Ins. Co.,* 133 Wn.2d 490, 946 P.2d 388 (1997); *Wilson v. Brand S Corp.,* 27 Wn. App. 743, 747, 621 P.2d 748 (1980) (double recovery is contrary to the principle of compensatory damages).

[3] CR 59(a) provides, in pertinent part, that a verdict may be vacated and a new trial granted on any of the following grounds:

(7) That there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law;

(8) Error in law occurring at the trial and objected to at the time by the party making the application.

time. *Sdorra v. Dickinson*, 80 Wn. App. 695, 701, 910 P.2d 1328 (1996) (citing *Cerjance v. Kehres*, 26 Wn. App. 436, 439, 613 P.2d 192 (1980)). The failure to object invites error. *Sdorra*, 80 Wn. App. at 701; *see also Agranoff v. Morton*, 54 Wn.2d 341, 346-47, 340 P.2d 811 (1959).

Here, Conrad could legally recover for both common law negligence and neglect. And Alderwood made no legal argument to the contrary. So there could then be no "double recovery" on a special verdict form which contained two damage sections—one for neglect and one for negligence.

The court's instructions required segregation of the damage awards in any event. And question 8 of the special verdict form instructed the jury not to award damages for neglect if it found the damages were the same as those for negligence. Jurors are presumed to follow the court's instructions.[4] Alderwood now claims that question 8 was confusing. But again no one complained about it at trial. *Lahmann*, 55 Wn. App. at 723.

Alderwood next argues that public policy will not support a double damage award under any circumstances, whether or not a special verdict form was objected to at trial. It points out that none of the cases it cites note any objection at trial to instructions allowing for double damages.[5] From this it argues that failure to make such an objection does not waive the issue on appeal. But none of these cases involved the issue of waiver for failure to object at trial. There is no indication in any of them that the double damage claims addressed by the court were not properly preserved for appeal.

[4] *See Hizey v. Carpenter*, 119 Wn.2d 251, 269-70, 830 P.2d 646 (1992); *Duchsherer v. N. Pac. Ry.*, 4 Wn. App. 291, 293, 481 P.2d 929 (1971).

[5] *Brink v. Griffith*, 65 Wn.2d 253, 259, 396 P.2d 793 (1964) (plaintiff not entitled to twice recover under defamation and invasion of privacy claims for same elements of damage growing out of same occurrence); *Pannell v. Food Servs. of Am.*, 61 Wn. App. 418, 444-45, 810 P.2d 952, 815 P.2d 812 (1991) (plaintiffs' employment discrimination action damages for front pay were duplicative as a matter of law to damages for lost business opportunity); *Kammerer v. W. Gear Corp.*, 27 Wn. App. 512, 526-27, 618 P.2d 1330 (1980) (award of damages for fraudulently inducing contract and breach of same contract was improperly duplicative), *aff'd*, 96 Wn.2d 416, 635 P.2d 708 (1981).

 Alderwood's argument is essentially that Conrad must show the substantial evidence upon which the jury differentiated between the damage awards—one for negligence and one for neglect.

But such an analysis would necessarily run over the line between identifying the factual basis for the jury's award[6] and appellate inquiry, which would necessarily delve into the jury's thought processes, or at least, our assumptions about those thought processes. Either way, those are matters which necessarily inhere in the verdict. *See, e.g., Cox v. Charles Wright Acad., Inc.*, 70 Wn.2d 173, 179-80, 422 P.2d 515 (1967).

Here, Conrad presented evidence of negligence. Conrad presented evidence of neglect. RCW 74.34.200. And they presented evidence of damages flowing from both negligence and neglect. It was then for the jury to sort out which damages were ascribable to which cause of action. Everything else inheres in this verdict. *Cox*, 70 Wn.2d at 179-80. Inherent in this verdict is a finding that both causes of action contributed to Enid's injuries and suffering. We need not, and indeed cannot, sort out exactly how the jury went about doing that. *Id.*

 Finally, Alderwood invokes the inherent authority of this court to consider these questions not preserved below, relying on *Falk v. Keene Corp.*[7] and *Siegler v. Kuhlman.*[8] But there is no pressing public policy reason for us to do so. And we decline to do so.

JURY'S AWARD PUNITIVE OR UNMISTAKABLY RESULT OF PASSION OR PREJUDICE

Alderwood next argues that the award here is shocking and unmistakably excessive. It notes that Enid's injuries were admittedly significant and obviously made her endure pain and suffering. But it argues, nonetheless, that the damages exceeded all bounds of appropriate compensation.

---

[6] *Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 915, 32 P.3d 250 (2001).

[7] 113 Wn.2d 645, 782 P.2d 974 (1989).

[8] 81 Wn.2d 448, 502 P.2d 1181 (1972).

It argues that the various awards defy logic and show outrage, animosity, or a desire to punish Alderwood.

Again, we review a trial court's decision to grant or deny a CR 59(a)(5) motion for reconsideration or new trial for abuse of discretion. *E.g., Lian v. Stalick*, 106 Wn. App. 811, 823-24, 25 P.3d 467 (2001). To grant the motion, the damages must be so excessive as to unmistakably indicate that the verdict was the result of passion or prejudice. 106 Wn. App. at 824; *Nord v. Shoreline Sav. Ass'n*, 116 Wn.2d 477, 486, 805 P.2d 800 (1991). " 'Before passion or prejudice can justify reduction of a jury verdict, it must be of such manifest clarity as to make it unmistakable.' " *Miller v. Yates*, 67 Wn. App. 120, 124, 834 P.2d 36 (1992) (quoting *Jacobs v. Calvary Cemetery & Mausoleum*, 53 Wn. App. 45, 49, 765 P.2d 334 (1988)). Absent such passion or prejudice, the amount of damages must be so excessive as to be outside the range of evidence or so great as to shock the court's conscience. *Id.* at 124-25. There must be no reasonable evidence or inference to justify the award. *Nord*, 116 Wn.2d at 486-87.

We start with the assumption that the jury accounted for Enid's age and average 3.74 year life expectancy when calculating the damage award, because that is what the trial judge told it to do. RP at 977 (instruction 16). *Hizey v. Carpenter*, 119 Wn.2d 251, 269-70, 830 P.2d 646 (1992).

The arguments on this point are a bit of a rehash of Enid's physical and mental condition before her June 10 leg fracture. Alderwood particularly emphasizes that Enid was 92 years old and already significantly compromised both mentally and physically when she came to Alderwood.

But Conrad's evidence showed that before June 10, Enid was sufficiently progressing in her recovery from the recent stroke to possibly be discharged from Alderwood. Dr. Jeffrey Reynolds, the forensic pathologist who performed Enid's autopsy, found no pathological signs of dementia in the autopsy. And he would have expected her to return home within a year. She was sitting up in a wheelchair, ate without a feeding tube, and engaged in conversation. In

other words, Alderwood's negligence and neglect deprived her of recovery from the stroke and caused her death.

The February 2000 stroke confined Enid to a wheelchair. She could not move her right arm and needed assistance with every aspect of daily life. She could occasionally eat without a feeding tube. But it was only temporary; she ultimately did require the feeding tube for nutrition. She had been diagnosed with chronic dementia prior to the stroke. Following the stroke, she had difficulty speaking or communicating. She did subsequently improve in her ability to converse, although she could not articulate anything about the cause of the June 10 fracture. And the record does not support Conrad's claim that Enid was improving right up until the June 10 femur fracture. Dr. Suzanne Staudinger, Enid's treating physician, testified Enid began to decline in mid-to-late May and there was concern whether she could ever walk again or eat adequately. Her husband Wafford testified "she really started going downhill" on June 1. RP at 541.

But the jury heard all of this.

It also heard substantial evidence of Alderwood's contributions to Enid's extremely serious injuries, pain and suffering, and ultimate wrongful death. Enid could feel pain from her injuries despite her prior condition. She cried out in pain from the June 10 femur fracture. And the pain from the compounding and open wound would be "top floor" according to Dr. Reynolds. RP at 263. Dr. Reynolds also said she was capable of feeling pain from the broken neck and sores attributable to the neck brace. Substantial evidence then supports the damage awards here.

■ Alderwood points to the $2.75 million pain and suffering award as patently excessive and obviously motivated by outrage or the desire to punish rather than compensate. Alderwood admits Enid's injuries obviously caused her pain and suffering but says the award is way too much given Enid's compromised condition prior to her injuries and "the relatively short period of time (a maximum of 10 months and 13 days) she suffered from her

injuries prior to her death." Br. of Appellant at 44. But the jury could certainly deem 10-plus months to be a long time for Enid—a highly vulnerable adult—to suffer the pain from injuries attributable to Alderwood's negligence and neglect.

Alderwood compares some specific damage awards to others in an attempt to show that the jury's verdict defies logic. But the jurors' collective thought processes inhere in the verdict. *Kiewit-Grice v. State*, 77 Wn. App. 867, 870-71, 895 P.2d 6 (1995). That said, the award to Conrad does not defy understanding in any event.

Alderwood's first example is that separate and apart from pain and suffering, the jury awarded $560,000 in damages for the compound fracture, despite awarding only $35,000 for the broken leg which precipitated the fracture. Alderwood explains there was no way to determine exactly how long Enid suffered from the compound fracture before her leg was amputated. She was confined to a wheelchair and did not have use of either of her legs. And there was no evidence she would ever walk again anyway. Yet, the jury awarded $100,000 for the amputation—nearly six times less than the $595,000 total for the fractures and compounding. And the amputation lasted until her death, more than 10 months later.

But the jury may well have thought that the negligence and neglect which rendered Enid an amputee was much more serious than the actual amputation, which then became a necessary therapy. The jury could then consider $100,000 to be an appropriate award for loss of the leg, particularly when she perhaps would not have walked again yet still had feeling in the leg.

Alderwood's second example is that the jury awarded $1 million for the broken neck, even though the evidence regarding the effect the injury had on Enid separate and apart from her existing condition or her pain and suffering was minimal. But clearly there was incremental pain and suffering from the broken neck and Enid's enduring the hard collar which caused skin ulcers going to the

bone. She would not have worn the neck collar but for the injury caused by Alderwood. The jury could surely determine she suffered substantially due to the broken neck. The $1 million award is not then without some legally cognizable reasons.

Alderwood's third example is that the awards for the broken neck and leg injuries (totaling $1,695,000) are particularly irrational when compared to the $160,000 award for her death. But following instruction 16, the jury may well have considered Enid's age and average life expectancy when awarding wrongful death damages of $160,000.

 Next, in its reply brief at pages 21-22, Alderwood contends the jury's punitive intent was manifest because it awarded noneconomic damages on the neglect claim at nearly three times the amount assessed for the very same injuries on the negligence claim. Thus, Alderwood says, the conclusion is inescapable that the jury was sending a message to Alderwood rather than compensating Enid for her injuries, in violation of Washington's firmly established policy against punitive damages. *Dailey v. N. Coast Life Ins. Co.*, 129 Wn.2d 572, 574, 919 P.2d 589 (1996).

But again, the jury could make some distinction between negligence and neglect. And it was then entitled to deem the neglect considerably more serious than the negligence. We do not disturb such determinations. *Kiewit-Grice*, 77 Wn. App. at 870-71.

For the first time in its reply brief at pages 19-21, Alderwood says passion and prejudice was engendered by the following testimony, elicited by Conrad, over objections: (1) Alderwood's alleged reluctant suspension of Aleisha Clark—the aide who forgot to replace the wheelchair armrest—because it felt she had done no wrong but a suspension was necessary to appease the State; (2) Conrad's insinuation that Ms. White had been convicted of second degree assault prior to her Alderwood employ and Alderwood failed to investigate her background; (3) DSHS investigator Elaina Madrid's testimony that Alderwood had

received another unrelated citation for failing to report and thoroughly investigate an incident involving other residents; and (4) the videotape of Enid (exhibit 44 to which Alderwood did not object) undoubtedly left a lasting and decidedly inflammatory visual impression that Alderwood's care (rather than Enid's stroke and preexisting conditions) caused the entirety of her compromised condition.

 Alderwood did not assign error to the admission of any of the above evidence, nor did it argue the points in its opening brief. The arguments are thus waived. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (appellate court will not consider argument raised and argued for first time in reply brief). But even if the claims are addressed, none rise to the level of producing a verdict of passion or prejudice.

Alderwood says the questioning of Ms. Clark improperly suggested it was not concerned about her conduct, but was rather only going through the motions for the State's benefit. But Ms. Clark went on to explain that the supervisor knew she was negligent but said he did not want to suspend her because he knew she did not fail to replace the armrest on purpose.

Next, Conrad's counsel asked generally of Alderwood's Director of Nursing, Debra Braswell, whether criminal background checks are provided for her decision to hire an individual. She said yes. Counsel then asked if a check was done on Ms. White. Again Ms. Braswell said yes. Counsel then asked if a conviction for second degree assault would be of concern to her in hiring someone. Defense counsel then moved for a mistrial on the basis there was no second degree assault conviction and Alderwood knew only of two misdemeanors. The court denied the motion.

 The jury later properly learned without objection that Ms. White was hired by Alderwood despite actual convictions for reckless endangerment, hit and run unattended, and reckless driving. She was placed on 24 months' probation with an order that she complete anger management or other counseling at the discretion of her community

corrections officer. And there was no record of Alderwood investigating the circumstances of these convictions or how they might affect her ability to care for a vulnerable adult. The jury thus would not have been left with the impression that Ms. White had been convicted of second degree assault, but was apprised of her convictions and lack of background investigation by Alderwood. The jury was entitled to know that Alderwood assigned a person with her background to care for Enid Conrad, and that it was she who first discovered the unexplained fracture.

Next, Alderwood objected on relevancy grounds to Ms. Madrid's testimony that it had previously received a citation for failure to thoroughly investigate an incident where patients wandered away in the middle of the night. The court admitted the testimony as relevant to the exact issue of unknown origin of occurrence. This testimony was not inflammatory so as to incite jury passion or prejudice to award damages. It simply showed subpar investigation practices by Alderwood.

 Alderwood next points to exhibit 44—the in-life tape of Enid Conrad—as engendering inflammatory passion and prejudice that contributed to an excessive verdict. It does not.

The tape, which was shown to the jury without objection, runs just over four and one-half minutes and shows Enid first in a wheelchair and then being transferred into a bed by nursing personnel. The camera focuses on her neck brace, left leg amputation, and contorted right leg that resulted from the stroke. Enid is in discomfort from the neck brace and appears to grimace with pain once near the beginning of the tape. The tape does not show her sores or skin breakdown beneath the neck brace. She is awake and appears somewhat alert during most of the tape, but it is not a documentary of extreme pain or fear.

The jury already knew of Enid's pre-June 10 physical and mental condition when viewing the video and could easily sort out what was attributable to the fault of Alderwood. Overall, the tape is a fair showing of the injuries and

suffering of an otherwise vulnerable adult—exactly the type of person protected under chapter 74.34 RCW.

Finally, Alderwood argues, again in its reply brief, that the verdict is excessive as a matter of law because of two recoveries for the same injuries on the same evidence. *Barney v. Safeco Ins. Co.*, 73 Wn. App. 426, 428, 869 P.2d 1093 (1994), *overruled on other grounds by Price v. Farmers Ins. Co.*, 133 Wn.2d 490, 946 P.2d 388 (1997). Again, Alderwood asks us to invoke our inherent authority to grant relief when an injustice has been done in the awarding of an excessive verdict. *Martin v. Foss Launch & Tug Co.*, 59 Wn.2d 302, 304, 367 P.2d 981 (1962).

The trial judge stated the verdict was perhaps surprising, but within the range of evidence and not punitive. We agree. We as a society make all sorts of judgments about value, ranging from contract/salary compensation for school teachers, professional athletes, corporate executives, and government workers, to the dollar amount placed on a plaintiff's injuries. Here, a jury of 12 people makes and made that decision. And barring some extraordinary factor, which the trial judge did not see here, and neither do we, courts should leave that judgment where it is vested by tradition and law—with the jury.

The court did not abuse its discretion in denying Alderwood's CR 59(a) motion. There was substantial evidence for the jury to make the award that it did.

## ATTORNEY FEES

RCW 74.34.200(3) is nonreciprocal in that only a prevailing plaintiff shall be awarded costs and attorney fees. Conrad's award in the trial court is affirmed and they are entitled to an additional award of costs and fees on appeal. *See, e.g., Martini v. Boeing Co.*, 137 Wn.2d 357, 377, 971 P.2d 45 (1999).

300

We affirm the judgment and award fees and costs to Conrad on appeal.

Brown, C.J., and Kurtz, J., concur.