# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| KENNETH FLYTE, as personal representative of THE ESTATE OF KATHRYN FLYTE, on behalf of their son JACOB FLYTE, and as personal representative of THE ESTATE OF ABIGAIL FLYTE,<br><br>　　　　　Respondents/Cross Appellants,<br><br>　　v.<br><br>SUMMIT VIEW CLINIC, a Washington corporation,<br><br>　　　　　Appellant/Cross Respondent. | No. 48278-9-II<br><br><br><br><br>UNPUBLISHED OPINION |

WORSWICK, P.J. — Kenneth Flyte sued Summit View Clinic (the Clinic) following the death of his wife, Kathryn,[1] from the H1N1 influenza virus[2] in August 2009. A jury found that the Clinic failed to provide Kathryn informed consent. Both parties appeal.

The Clinic appeals the judgment of $13,350,000, arguing that the trial court erred in denying a motion for mistrial, a motion to dismiss two jurors, and motions for new trial and that the jury's damages award was so excessive as to show it was the result of passion or prejudice. The Flytes cross-appeal, arguing that the trial court erred in reducing the jury's damages award by offsetting the amount of the Flytes' prior settlement with another health care provider.

---

[1] We refer to the Flytes by their first names for clarity, intending no disrespect.

[2] The H1N1 influenza virus is a potentially fatal illness also known as the "swine flu."

We hold that the trial court did not err in denying the motions for mistrial, to dismiss jurors, or for new trial and that the jury's damages award was not the result of passion or prejudice. We further hold that the trial court erred in reducing the damage award by offset. Consequently, we remand to the trial court with instructions to enter judgment for the Flytes for the full amount of the jury's verdict against the Clinic.

FACTS

On June 23, 2009, Kathryn, who was seven months pregnant, began feeling ill. She visited the Clinic the morning of June 26. In the months preceding Kathryn's visit, the Clinic had received public health alerts from authorities about the swine flu pandemic. Kathryn's symptoms were consistent with influenza, and although the health alerts recommended treating pregnant women exhibiting flu symptoms with the drug Tamiflu, the Clinic's staff did not inform Kathryn about the pandemic or available treatment.

As Kathryn's condition deteriorated, she received treatment from other medical providers, including those within the Franciscan Health System. Kathryn and Kenneth's daughter, Abbigail, was delivered by caesarean section on June 29. Kathryn died on August 11, and Abbigail died six months later.

Before filing their claim against the Clinic, the Flytes entered into a settlement agreement with Franciscan Health Systems for $3.5 million. The trial court did not hold a reasonableness hearing regarding this settlement.[3] Kenneth then sued the Clinic, alleging that the Clinic failed

---

[3] It is likely that the trial court did not hold a reasonableness hearing because no party alleged that the Clinic and Franciscan Health Systems were jointly and severally liable.

to adhere to standards of care and that it breached its duty of informed consent.[4]  The matter proceeded to a jury trial resulting in a verdict in favor of the Clinic.  The Flytes appealed, and we reversed and remanded the case for a new trial.  *Flyte v. Summit View Clinic*, 183 Wn. App. 559, 562, 333 P.3d 566 (2014).  Before the second trial, the Flytes dismissed with prejudice all claims of medical negligence, as well as all claims arising from Abbigail's death.

The Clinic filed a number of motions in limine.  First, the Clinic moved to limit evidence regarding Abbigail's death.  The trial court stated that it would determine the admissibility of the evidence in context as the trial progressed but that Kenneth could testify that Abbigail was born prematurely and that she passed away.  In addition, the trial court granted the Clinic's motion in limine to exclude testimony regarding its violation of standards of care because the Flytes dismissed all medical negligence claims.  Despite the absence of a reasonableness hearing, and without evidence of joint and several liability, the trial court also granted the Clinic's motion to offset any potential damages award with the Flytes' prior $3.5 million settlement agreement with Franciscan Health Systems.

In opening argument, the Flytes' counsel stated that Abbigail "never really seemed to the level of health as other children, in [Kenneth's] observations, and her health turned for the worse."  3 Verbatim Report of Proceedings (VRP) at 459.  The Clinic objected.  The trial court determined the statements were "somewhat beyond the scope" and asked the Flytes' counsel to limit his discussion of Abbigail's death.  3 VRP at 460.  The Flytes' counsel continued: "[Kathryn] deserved to make her own choice.  She deserved to live.  Abbigail Flyte deserved to

---

[4] Kenneth sued the Clinic personally, as the representative of Kathryn's and Abbigail's estates, and as a guardian of his son, Jacob.  We refer to the collective plaintiffs as "the Flytes."

3

live." 3 VRP at 472. The Clinic asked that the statement be stricken, and the trial court

instructed the jury to disregard counsel's statement.

During Kenneth's testimony, his counsel asked the following questions:

[THE FLYTES' COUNSEL]: [Abbigail] was in the hospital a long time, too, wasn't she?
[KENNETH]: She was in the hospital, like I said, until the day [Kathryn] passed.
[THE CLINIC]: Your Honor, relevance.
[THE FLYTES' COUNSEL]: Loss of consortium.
THE COURT: Well, I'm going to sustain the objection to that question. . . .
[THE FLYTES' COUNSEL]: You had to make the decision without [Kathryn] to turn off the life support for [Abbigail], too, did you not, sir?
[KENNETH]: I had to give her a name without my wife. I had to do all sorts of stuff without her, and that was the hardest part, yes, unplugging her without help.

4 VRP at 653. The Flytes' counsel also made statements and asked a number of questions about

diagnosing H1N1 and about the Clinic's operations.

During trial, juror 8 notified a judicial assistant that a chart detailing the distinctions

between symptoms for a cold, the seasonal flu, and H1N1 was taped to a bookcase in the jury

room. The trial court questioned the jurors. Juror 8 said that she did not read the chart or discuss

it with other jurors. Juror 8 also stated that the chart would not affect her view of the case

because she had "been told to disregard anything outside of the courtroom." 5 VRP at 791.

Juror 4 said that she did not read the information on the chart and was still able to listen to the

case fairly and impartially. Only jurors 4 and 8 noticed the H1N1 chart.

Following the jurors' disclosures, the Clinic moved for mistrial, arguing juror misconduct

based on jurors 4 and 8's exposure to extrinsic evidence. The trial court denied the Clinic's

motion, stating that there would be no prejudice to the jury's verdict because jurors 4 and 8 did

not actually read the chart. After the trial court denied the Clinic's motion for mistrial, the Clinic

moved to excuse jurors 4 and 8. The trial court denied the Clinic's motion, and the parties continued with trial.

In closing argument, the Flytes' counsel stated:

So [Kenneth], I submit to you for the loss of his wife, and all of the loss he experienced, the range that would be appropriate is also 1 to 5 million. But [Kenneth] has given me an instruction, and I'm bound by it because he's my client, he's told me to recommend that the jury award him a dollar. Because he doesn't care about the money; he cares about accountability. He cares about proving the point that the [Clinic] is responsible.

13 VRP at 2041. The Clinic objected, arguing that the Flytes' counsel was arguing for exemplary damages. The trial court overruled the Clinic's objection.

The jury returned a special verdict, finding that the Clinic failed to provide informed consent to Kathryn. The jury also awarded $16.7 million in damages: $5 million to the estate of Kathryn, $5 million to Kenneth, and $6.7 million to Jacob. Based on its prior ruling, the trial court reduced the Flytes' damages award by his $3.5 million settlement with Franciscan Health Systems.[5]

Following the jury's verdict, the Clinic filed a motion for new trial, arguing that the trial court erred by failing to order a mistrial or excuse jurors 4 and 8 after they reviewed the H1N1 chart, the Flytes' counsel engaged in flagrant misconduct by arguing and presenting evidence in violation of an order in limine and by asking the jury to award exemplary damages, and the damages award was so excessive as to unmistakably show it was the result of the jury's passion

---

[5] In determining the Clinic's total offset from the Flytes' $16.7 million damages award, the trial court determined sua sponte that Flyte's claim against Franciscan Health Systems for Abbigail's wrongful death "probably had a settlement value of no more than $150,000." Clerk's Papers (CP) at 407. Accordingly, Flyte's $16.7 million damages award was reduced by $3,350,000 instead of $3.5 million.

or prejudice. The trial court denied the Clinic's motion. The Clinic appeals the judgment, and the Flytes cross-appeal the trial court's reduction of the jury award.

ANALYSIS

I. JUROR MISCONDUCT

The Clinic first contends the trial court erred by denying (a) its motion for mistrial because the court made a subjective inquiry into the actual effect of extrinsic evidence on the jury, (b) its motion to dismiss jurors 4 and 8, and (c) its related motion for new trial because the jurors were inadvertently exposed to extrinsic evidence. We disagree.

A. *Motion for Mistrial*

The Clinic argues the trial court applied an incorrect legal standard in denying its motion for mistrial after jurors 4 and 8 were exposed to extrinsic evidence. Specifically, the Clinic contends that the trial court made a subjective inquiry into the actual effect of the evidence on the jurors instead of an objective inquiry into whether the jurors could have been prejudiced. We disagree.

We review a trial court's denial of a motion for mistrial for abuse of discretion. *Smith v. Orthopedics Int'l, Ltd.*, 149 Wn. App. 337, 341, 203 P.3d 1066 (2009). A trial court abuses its discretion when its decision is "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Breckenridge v. Valley Gen. Hosp.*, 150 Wn.2d 197, 203-04, 75 P.3d 944 (2003) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). A trial court "necessarily abuses its discretion if it applies the incorrect legal standard." *Gillett v. Conner*, 132 Wn. App. 818, 822, 133 P.3d 960 (2006).

6

To determine whether a mistrial is warranted because of juror misconduct, we first decide "whether the alleged information actually constituted misconduct and, second, if misconduct did occur whether it affected the verdict." *Richards v. Overlake Hosp. Med. Ctr.*, 59 Wn. App. 266, 270, 796 P.2d 737 (1990). A jury's consideration of novel or extrinsic evidence is misconduct and can be grounds for a mistrial.[6] *State v. Balisok*, 123 Wn.2d 114, 118, 866 P.2d 631 (1994). The trial court must make an objective inquiry into whether the extrinsic evidence *could have* affected the jury's determination and not a subjective inquiry into the *actual effect* of the evidence on the jury. *Kuhn v. Schnall*, 155 Wn. App. 560, 575, 228 P.3d 828 (2010). A trial court must grant a motion for mistrial if there is any reasonable doubt that the misconduct affected the jury's verdict. *Richards*, 59 Wn. App. at 273.

Here, juror 8 notified a judicial assistant that a chart detailing the differences between symptoms of a cold, the seasonal flu, and H1N1 was taped to a bookcase in the jury room. The trial court questioned juror 8 and asked if she had read through the information on the chart. She answered in the negative. Juror 8 said that she pointed out the chart to juror 4 but that she did not discuss the chart with her. Juror 8 also stated that the chart would not affect her view of the case because she had "been told to disregard anything outside of the courtroom." 5 VRP at 791.

The trial court also questioned juror 4. She stated that she did not read the information on the chart and was still able to listen to the case fairly and impartially. The Clinic moved for a

---

[6] Evidence is novel or extrinsic if it is wholly outside the evidence received at trial and, as a result, is not subject to objection, cross-examination, explanation, or rebuttal by either party. *See Adkins v. Aluminum Co. of Am.*, 110 Wn.2d 128, 137, 750 P.2d 1257 (1988). The H1N1 chart was not admitted as evidence at trial. Therefore, we consider the chart extrinsic evidence.

mistrial. The trial court denied the Clinic's motion, stating that there would be no prejudice to the jury's verdict because jurors 4 and 8 did not actually read the chart.

The trial court did not abuse its discretion in denying the Clinic's motion for mistrial because there was no possibility that the extrinsic evidence could have affected the jury's verdict. In determining whether to grant the Clinic's motion for mistrial, the trial court based its decision on an objective inquiry, reasoning that there was no possibility that extrinsic evidence could affect a jury's verdict when jurors do not read and digest such evidence. While the trial court did make a subjective inquiry into whether the evidence had an actual effect on the jurors, it nonetheless conducted the requisite objective inquiry in denying the Clinic's motion.

Because the trial court based its decision on the correct legal standard, it did not commit an error of law. Thus, the trial court did not abuse its discretion in denying the Clinic's motion for mistrial.[7]

B.      *Motion to Dismiss Jurors*

The Clinic also argues the trial court erred in denying its motion to dismiss jurors 4 and 8 because the jurors committed misconduct when they were inadvertently exposed to extrinsic evidence. We disagree.

We review a trial court's decision of whether to dismiss a juror under RCW 2.36.110 for abuse of discretion. *Hough v. Stockbridge*, 152 Wn. App. 328, 340, 216 P.3d 1077 (2009). Under RCW 2.36.110, a judge must excuse a juror who has manifested unfitness to serve on a

---

[7] The Clinic appears to suggest that despite their assertions to the contrary, jurors 4 and 8 did read and discuss the H1N1 chart. However, we do not review any credibility determinations the trial court may have made in this regard. "Credibility determinations are for the trier of fact and are not subject to review." *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).

jury. Even where a juror commits misconduct, the misconduct does not necessarily "reflect that a juror has manifested unfitness to serve on the jury as required under RCW 2.36.110." *State v. Depaz*, 165 Wn.2d 842, 856, 204 P.3d 217 (2009). Accordingly, the question for the trial court is whether the challenged juror can set aside preconceived ideas and consider the evidence fairly and impartially. *Hough*, 152 Wn. App. at 341.

After the trial court denied the Clinic's motion for mistrial, the Clinic moved to excuse jurors 4 and 8. The trial court denied the Clinic's motion and said:

> Certainly the difference in these symptoms is a major issue, but the jurors said they didn't read the information provided in this chart. I kind of share, to some extent, [the Clinic's] concern that this might be deemed as somehow authoritative or objective because it was posted by the Court in the jury room, but it appears to me that the jurors, in fact, did not absorb this information.

5 VRP at 801-02.

While the jurors were exposed to the H1N1 chart, a juror's mere exposure to extrinsic evidence does not, by itself, warrant dismissal. Instead, the trial court must determine whether the juror has manifested unfitness to serve by an inability to consider the case fairly. Jurors 4 and 8 stated that they did not read or discuss the H1N1 chart. As a result, the trial court reasoned that they were able to consider the evidence presented at trial fairly and impartially. Accordingly, the trial court determined that jurors 4 and 8 did not manifest unfitness to serve. Because the trial court's decision was reasonable and based on tenable grounds, the trial court did not abuse its discretion in denying the Clinic's motion to dismiss jurors 4 and 8.

9

C.      *Motion for New Trial for Juror Misconduct*

The Clinic also argues that the trial court erred in denying its motion for new trial because jurors 4 and 8 committed misconduct when they were inadvertently exposed to extrinsic evidence. We disagree.

We review the trial court's denial of a motion for new trial based on juror misconduct for abuse of discretion. *McCoy v. Kent Nursery, Inc.*, 163 Wn. App. 744, 757, 260 P.3d 967 (2011). To determine whether a new trial is warranted because of juror misconduct, we first decide "whether the alleged information actually constituted misconduct and, second, if misconduct did occur whether it affected the verdict." *Richards*, 59 Wn. App. at 270. Accordingly, the trial court must make an objective inquiry into whether the extrinsic evidence could have affected the jury's determination. *Kuhn*, 155 Wn. App. at 575. The trial court must grant a party's motion for new trial if there is any reasonable grounds to believe that the party has been prejudiced. *Richards*, 59 Wn. App. at 273.

Following the verdict, the Clinic filed a motion for new trial, arguing, among other things, that the trial court abused its discretion because jurors 4 and 8 committed misconduct that prejudiced the jury's verdict. The trial court denied the Clinic's motion, stating:

> So nothing brought in by the jurors. There's no indication they discussed it. They didn't withhold anything from it. . . . And there's no indication that what little they saw in this made any real difference. Everything on the chart, they would have heard something during the trial. So I can't say there's any grounds for a new trial based on misconduct.

VRP (Dec. 1, 2015) at 33.

The trial court made an objective inquiry into the effect of the H1N1 chart. The trial court reasoned that there was no possibility that the chart could have affected the jury's verdict

because jurors 4 and 8 did not read, discuss, or digest the information contained in the chart. Moreover, the trial court noted that because witnesses had testified about the information contained in the H1N1 chart, there were no reasonable grounds to believe that the Clinic had been prejudiced by it. Because the trial court's decision was reasonable and based on tenable grounds, the trial court did not abuse its discretion in denying the Clinic's motion for new trial.

## II. COUNSEL'S MISCONDUCT

The Clinic also argues the trial court erred in denying its motion for new trial because the Flytes' counsel committed misconduct by (a) violating motions in limine and relying on irrelevant evidence and (b) making an improper "golden rule" argument and requesting that the jury award exemplary damages. We disagree.

We review the trial court's decision on a motion for new trial under CR 59(a)(2) for an abuse of discretion. *Teter v. Deck*, 174 Wn.2d 207, 222, 274 P.3d 336 (2012). In this context, we apply a specialized test for an abuse of discretion, and we must determine whether the misconduct created "such a feeling of prejudice . . . in the minds of the jury as to prevent a litigant from having a fair trial." *Aluminum Co. of Am. v. Aetna Cas. & Sur. Co.*, 140 Wn.2d 517, 537, 998 P.2d 856 (2000).

Under CR 59(a)(2), a trial court may grant a new trial when the prevailing party's misconduct materially affects the losing party's substantial rights. To prevail, the losing party must show that (1) the conduct complained of is misconduct and not mere aggressive advocacy, (2) the misconduct is prejudicial in the context of the entire record, (3) opposing counsel objected to the misconduct at trial, and (4) the misconduct was not cured by the trial court's instructions. 174 Wn.2d at 226.

A.      *Violations of Motions in Limine*

The Clinic argues the trial court erred in denying its motion for new trial because the Flytes' counsel committed misconduct by violating motions in limine and introducing irrelevant evidence at trial regarding the Clinic's alleged negligence and Abbigail's death. We hold that the Flytes' counsel did not commit misconduct.

ER 103(c) imposes a duty on counsel to keep inadmissible evidence from the jury. *Teter*, 174 Wn.2d at 223. Attempting to present the jury with inadmissible evidence or impermissible argument is misconduct. *See* 174 Wn.2d at 224 n.12. Further, "[p]ersistently asking knowingly objectionable questions is misconduct." 174 Wn.2d at 223. Even if the objections are sustained, the misconduct is prejudicial because it puts opposing counsel in the position of making constant objections, which can leave the jury with the impression that the opposing party has something important to hide. 174 Wn.2d at 223. Accordingly, "[m]isconduct that continues after warnings can give rise to a conclusive implication of prejudice." 174 Wn.2d at 223.

1. The Clinic's Negligence

The trial court granted the Clinic's motion in limine to exclude testimony regarding the Clinic's violation of standards of care. During trial, the Flytes' counsel asked expert witnesses a number of questions regarding the diagnosis of H1N1 and the Clinic's operations:

> [THE FLYTES' COUNSEL]: Now . . . tell me if this is correct -- you wouldn't wait for any sort of diagnosis of H1N1 to offer the Tamiflu?
> [EXPERT WITNESS]: I would try to get the diagnosis. I would certainly have gotten a culture, a viral culture. Whether I could have done it in my office or whether I would have to send it out, I would certainly have done that.
> [THE CLINIC]: Excuse me, Your Honor. I move to strike the testimony. There's no claim that Dr. Marsh was required to test this patient.
> [THE FLYTES' COUNSEL]: It's just medical context.
> [THE CLINIC]: Your Honor, with due respect, I think that we need to be clear on the claims.

THE COURT: I agree, so the jury should disregard the last statement. It's not one of the claims at issue here.

6 VRP at 971.

The Flytes' counsel continued:

[THE FLYTES' COUNSEL]: . . . [I]f Dr. Marsh had taken the time to learn about the Tylenol, should that have impacted the manner in which he extended care?
[THE CLINIC]: Your Honor, I object to the form, "taken the time." That's lack of foundation; no evidence.
THE COURT: I'll sustain the objection as to the form. Maybe restate that.
[THE FLYTES' COUNSEL]: Would a reasonably prudent physician who learned that [Kathryn] was taking Tylenol on June 26, 2009, would that have informed his course of treatment on that day?
[EXPERT WITNESS]: It would have influenced his course of treatment.

6 VRP at 1072-73.

Then, the Flytes' counsel asked:

[THE FLYTES' COUNSEL]: In a general sense . . . do you have any criticism for what [the Clinic] describe[s] having done?
[THE CLINIC]: Excuse me, Your Honor; object to the form of that question. It's argumentative as well.
[THE FLYTES' COUNSEL]: Are you critical of the possibility that nursing staff at the [Clinic] say they just don't sometimes read the health advisories?
[THE CLINIC]: Excuse me, Your Honor. I object to the form of the question as well.
THE COURT: Overruled, if you can answer that . . . .
[EXPERT WITNESS]: Well, if that's the testimony, I would think there's a criticism in that.
[THE FLYTES' COUNSEL]: But other than that, you don't have a criticism of what the [Clinic] claims they did?
[EXPERT WITNESS]: No.
[THE CLINIC]: Excuse me, Your Honor; again, the tone and nature of that question is highly --
THE COURT: Well, I couldn't help but notice the quotation marks either, so I'll sustain the objection.

6 VRP at 1077-78.

While questioning another expert witness, the Flytes' counsel asked:

> [THE FLYTES' COUNSEL]: So I want to pull back a little. As it relates to this chart that [the Clinic] made, Defendant's 150, you still treat with Tamiflu?
> [EXPERT WITNESS]: You inform patients, based on your clinical experience, on the available data.
> [THE CLINIC]: Your Honor, I'm going to object to this because this is not what he was brought here for. It was on causation. We're not on treatment. Treatment is not even at issue. It's informed consent and cause.
> [THE FLYTES' COUNSEL]: Your Honor, this is redirect based upon cross-examination.
> THE COURT: I'll overrule the objection.

7 VRP at 1251.

On cross-examination of one of the Clinic's expert witnesses, the following exchange took place:

> [THE FLYTES' COUNSEL]: And you're familiar with the phrase "viral shedding;" is that right?
> [EXPERT WITNESS]: Yes.
> [THE FLYTES' COUNSEL]: And would you agree with me that, for example, a triage protocol is designed, at least in part, to help reduce the possibility of viral shedding in your own medical facility by patients who are infected?
> [THE CLINIC]: Your Honor, I'm going to object; relevance as to informed consent claim.
> THE COURT: It does seem a bit far afield, so I'll sustain the objection.

8 VRP at 1385-36.

While on cross-examination of another expert witness for the Clinic, Flyte's counsel asked:

> [THE FLYTES' COUNSEL]: Is it your opinion that the [Clinic] was diligent in response to the information they received about the swine flu pandemic?
> [THE CLINIC]: Your Honor, again, scope. There's no standard of care claim against [the Clinic].
> [THE FLYTES' COUNSEL]: It's just for setting the -- and I don't want to call it impeachment. It's a conversation.
> [THE CLINIC]: Your Honor --
> THE COURT: Well, I'm going to sustain the objection. This is beyond the scope of his testimony and I believe his designation.

14

[THE FLYTES' COUNSEL]: So let's move topics, if we could. I want to talk about -- and you recognize that when I ask you these questions, the Flyte family's representation is we don't agree with your hypothetical.

[THE CLINIC]: Again, Your Honor, objection. It's a speech.

THE COURT: It didn't sound like a question, so I'll sustain the objection.

[THE CLINIC]: And move to disregard.

THE COURT: I'm going to instruct the jury to disregard [the Flytes' counsel's] last statement.

9 VRP at 1655-56.

On cross-examination of another expert witness for the Clinic, Flyte's counsel continued:

[THE FLYTES' COUNSEL]: I want to ask you just very briefly, you testified that in May of 2009 this New York Times article presented information to you as a practitioner about the fact that these patients weren't showing up with a fever. As a practical matter, what does that mean for you as an OB/GYN for how you care for patients or things you look for?

[THE CLINIC]: Objection, Your Honor; beyond the scope and back into the case in chief.

[THE FLYTES' COUNSEL]: Your Honor --

THE COURT: I'll overrule the objection if you can answer that . . . .

  . . . .

[EXPERT WITNESS]: Yes. And my answer would be, again, going back to the fact that [Kathryn] was a pregnant woman in the beginning of her third trimester, I would be very cautious to question her about any of the symptoms which I felt might help me make the diagnosis --

[THE CLINIC]: Your Honor, I would object at this point. Again, we are going beyond the scope of the question and also beyond the scope --

THE COURT: I did not understand the question to ask about [Kathryn]. Why are you answering about [Kathryn]? Please listen to the question that's asked.

So, I'll sustain the objection. The jury should disregard the last answer . . . which wasn't responsive.

12 VRP at 1952-53.

During closing argument, the Flytes' counsel stated:

[THE FLYTES' COUNSEL]: Health alerts, we covered that. If a facility is truly being diligent, they don't just lose critical health alerts.

These particular systemic failures I would categorize as having an overall lack of preparedness and a breakdown in the safety net. The safety net that starts, again, at the World Health Organization in some circumstances, through the CDC,

15

down to the frontline providers. These are systemic failures that caused the issues here. These are systemic failures that could have been prevented.

With more specificity in this case --

[THE CLINIC]: Excuse me, Your Honor. I must object. There is no standard of care claim and no standard of care testimony. And I think we're getting beyond the scope of the plaintiff's claims.

THE COURT: Well, the claim is for informed consent.

[THE CLINIC]: There is no evidence of any negligence on the part of the clinic. No claim, Your Honor.

THE COURT: There's no claim for that.

[THE FLYTES' COUNSEL]: We're not arguing negligence.

[THE CLINIC]: Your Honor, with respect, this one doesn't go to -- I mean, all of these go to a claim of negligence, which isn't at issue.

[THE FLYTES' COUNSEL]: I haven't really had an opportunity to --

THE COURT: I'll overrule the objection at this point. I will remind the jury that the claim is for a lack of informed consent.

. . . .

[THE FLYTES' COUNSEL]: If the [Clinic] wasn't treating so many patients, maybe they would have caught that. . . .

[THE CLINIC]: Your Honor, this is beyond the scope of the claim. There's no claim of any negligence of the number of patients.

[THE FLYTES' COUNSEL]: I'm just reiterating what we talked about earlier.

[THE CLINIC]: No. Your Honor --

THE COURT: I'll sustain the objection.

[THE CLINIC]: Thank you.

THE COURT: Again, there's not a claim for negligence here.

. . . .

[THE FLYTES' COUNSEL]: Temperature, the history of temperature is also not in the records, and it wasn't considered . . . in relation to informed consent. This is a clinic that is treating too many people too quickly and missing critical information.

[THE CLINIC]: Your Honor, again, that is beyond the scope of the claims.

[THE FLYTES' COUNSEL]: It's part of the informed consent.

[THE CLINIC]: Excuse me, Your Honor. They claimed they missed because too many people. There's no claim for negligence.

THE COURT: There's no claim for negligence; its informed consent.

[THE FLYTES' COUNSEL]: I'm specifically talking about why Dr. Marsh --

THE COURT: Let's talk about informed consent.

13 VRP at 2008-09, 2012-14.

During its closing argument, the Clinic said, "Don't you think that if there were claims of negligence, they would have been brought to you for consideration[?]" 13 VRP at 2052. On rebuttal, the Flytes' counsel argued:

> [THE FLYTES' COUNSEL]: [The Clinic], we heard all of these objections, and you only pay attention to what the Court allows us to argue. [The Clinic] kept putting up slides, something about this is not a negligence case, and all of that. [The Clinic] was way negligent, way negligent in this case.
> [THE CLINIC]: Your Honor, object to that argument.
> [THE FLYTES' COUNSEL]: They --
> [THE CLINIC]: Your Honor, I object to that argument. There is no evidence. It's not supported by the evidence and it's prejudicial. [The Flytes' counsel's] opinions are irrelevant.
> THE COURT: Let's stick to informed consent, [the Flytes' counsel]. That's the claim the jury is to evaluate.
> [THE FLYTES' COUNSEL]: This case has been compartmentalized legally into what's called informed consent. That's what you're deciding the case on. The fact that the [Clinic] may or may not have been really negligent about other topics, that's not what you're here to decide. It's: Did they provide informed consent. That's a true statement about this case, just to kind of clear that up. So if there's a representation that we don't think they were negligent, that's not right.
> [THE CLINIC]: Your Honor, object. That's just what he was instructed not to say.
> THE COURT: I'll sustain the objection.
> [THE CLINIC]: Thank you. Disregard.
> THE COURT: The jury should decide the case on the evidence and the instructions, not on personal opinions.
> . . . .
> [THE FLYTES' COUNSEL]: Now with regard to the evidence of this case, Dr. Gravett told you that he reviewed the testimony of Jack Brehan, who talked about he has some medical challenges.
> [THE CLINIC]: Your Honor, there is no evidence to support that. I object to that. There's no evidence whatsoever.
> THE COURT: I think that's correct. I'll sustain the objection
> [THE CLINIC]: Thank you. Disregard.
> THE COURT: The jury should disregard the comment about Mr. Brehan.
> . . . .
> [THE FLYTES' COUNSEL]: Now, the significance of that is this: Is that there is testimony clearly that Jack Brehan told Dr. Marsh and told Andrea Brady about this history of fever.
> [THE CLINIC]: Your Honor, I object. There is no evidence of that.
> THE COURT: Sustained.
> [THE CLINIC]: Thank you. Disregard.

17

> THE COURT: The jury should disregard that last statement. Mr. Brehan did not testify.

13 VRP at 2109-11.

The Clinic's motion for new trial was based in part on the Flytes' counsel allegedly committing misconduct by violating the order in limine and attempting to introduce evidence of medical negligence. The trial court denied the motion, determining that the Flytes' counsel "did say some things that could have been thought of as arguing negligence. . . . The phrase about 'they were way negligent,' however, was in rebuttal to [the Clinic] in [its] closing saying that negligence isn't an issue, something like that, so he was rebutting that." VRP (Dec. 1, 2015) at 33-34. The trial court continued: "[T]he jury was told this is an informed consent case. They were given instructions on informed consent. That's all they were instructed on. They were told to follow the instructions. I don't have any reason to think they didn't follow the instructions." VRP (Dec. 1, 2015) at 34.

While the Flytes' counsel asked multiple questions and argued about the Clinic's quality of care and its operations, it appears from the record that counsel did not ask knowingly objectionable questions and properly reformed his questions upon the Clinic's sustained objections. The Flytes' counsel's comment that the Clinic was "way negligent" on rebuttal was a direct response to the Clinic's argument that had the Clinic been negligent, the Flytes would have raised a negligence claim. Accordingly, the Clinic fails to show that the Flytes' counsel's actions were misconduct and not merely aggressive advocacy. Because counsel did not commit misconduct, the trial court did not abuse its discretion in denying the Clinic's motion for new trial.

2. Abbigail's Death

After the Flytes dismissed all claims arising from Abbigail's death, the Clinic filed a motion in limine to limit evidence regarding her death. The trial court determined that Kenneth could testify that Abbigail was born prematurely and could discuss where he was and how she passed away but that it would "work with [Kenneth's testimony regarding Abbigail] in context." 1 VRP at 42.

During opening argument, the Flytes' counsel stated that "[Abbigail] held on for a number of months, but she never really seemed to the level of health as other children, in [Kenneth's] observations, and her health turned for the worse." 3 VRP at 459. The Clinic objected, stating that counsel's statements were beyond the scope of the claims at issue. The trial court said the statements were "somewhat beyond the scope" and asked the Flytes' counsel to limit his discussion of Abbigail's death. 3 VRP at 460. The Flytes' counsel continued: "[Kathryn] deserved to make her own choice. She deserved to live. Abbigail Flyte deserved to live." 3 VRP at 472. The Clinic asked that the statement be stricken, and the trial court instructed the jury to disregard the Flytes' counsel's statement.

During direct examination of Kenneth, the following exchange took place:

[THE FLYTES' COUNSEL]: [Abbigail] was in the hospital a long time, too, wasn't she?
[KENNETH]: She was in the hospital, like I said, until the day [Kathryn] passed.
[THE CLINIC]: Your Honor, relevance.
[THE FLYTES' COUNSEL]: Loss of consortium.
THE COURT: Well, I'm going to sustain the objection to that question . . . .
[THE FLYTES' COUNSEL]: You had to make the decision without [Kathryn] to turn off the life support for [Abbigail], too, did you not, sir?
[KENNETH]: I had to give her a name without my wife. I had to do all sorts of stuff without her, and that was the hardest part, yes, unplugging her without help.

19

4 VRP at 653. The trial court denied the Clinic's motion for a new trial, which was based in part on the Flytes' counsel allegedly committing misconduct by introducing evidence of Abbigail's death.

In determining whether the Flytes' counsel violated orders in limine, we note that the trial court did not rule on the Clinic's motion in limine to limit testimony regarding Abbigail's death, stating it would determine the admissibility of the testimony as it arose in context. As a result, there was no order regarding this evidence, and it was not clear what testimony would be allowed. Thus, the Flytes' counsel did not ask knowingly objectionable questions on the subject of Abbigail's death. Further, the Flytes' counsel properly limited the scope of his argument and direct examination of Kenneth upon the Clinic's sustained objections. Therefore, the Flytes' counsel did not commit misconduct, and the trial court did not abuse its discretion in denying the Clinic's motion for new trial.

B.      *Request for Exemplary Damages*

The Clinic also argues the trial court erred in denying its motion for new trial because the Flytes' counsel committed misconduct by making an improper "golden rule" argument and requesting that the jury award exemplary damages. We disagree.

Counsel commits misconduct by inviting the jury to decide a case based on anything other than the law and the evidence presented, including appeals to passion and prejudice. *M.R.B. v. Puyallup Sch. Dist.*, 169 Wn. App. 837, 858, 282 P.3d 1124 (2012). Accordingly, requesting that jurors place themselves in the position of one of the parties to the litigation constitutes an improper, "golden rule" argument. *A.C. ex rel. Cooper v. Bellingham Sch. Dist.*, 125 Wn. App. 511, 523, 105 P.3d 400 (2004). This argument is improper because it asks the

jury to deviate from neutrality and to decide the case on the basis of personal interest, rather than on the basis of evidence. 125 Wn. App. at 523-24.

Here, in closing argument, the Flytes' counsel stated:

So [Kenneth], I submit to you for the loss of his wife, and all of the loss he experienced, the range that would be appropriate is also 1 to 5 million. But [Kenneth] has given me an instruction, and I'm bound by it because he's my client, he's told me to recommend that the jury award him a dollar. Because he doesn't care about the money; he cares about accountability. He cares about proving the point that the [Clinic] is responsible.

13 VRP at 2041. The Clinic objected, arguing that the Flytes' counsel was arguing for exemplary damages. The trial court overruled the Clinic's objection.

The Flytes' counsel's argument to the jury that Kenneth only wanted one dollar because he wanted the Clinic to be held accountable was not an improper "golden rule" argument or request for exemplary damages. The Flytes' counsel did not ask the jurors to decide the case on the basis of their personal interests or to place themselves in Kenneth's shoes. Instead, the Flytes' counsel stated that if the jury determined the evidence supported a finding that the Clinic was responsible, then Kenneth wanted only a nominal damages award. In addition, the Flytes' counsel provided the jury with an award range that he felt was supported by the evidence. Accordingly, the Flytes' counsel did not commit misconduct. Therefore, the trial court did not abuse its discretion in denying the Clinic's motion for new trial on this basis.

### III. DAMAGES AWARD

The Clinic also argues the trial court erred in entering judgment on the jury's verdict and denying the Clinic's motion for new trial because the jury's damages award was so excessive as to show that it was the result of the jury's passion or prejudice. We disagree.

21

We review a trial court's decision to grant or deny a CR 59(a)(5) motion for new trial for abuse of discretion. *Conrad ex rel. Conrad v. Alderwood Manor*, 119 Wn. App. 275, 293, 78 P.3d 177 (2003). In this context, a trial court abuses its discretion in denying a new trial where the jury's damages award is contrary to the evidence. *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 454, 191 P.3d 879 (2008).

The jury's damages award should be overturned only in the most extraordinary circumstances. *Miller v. Yates*, 67 Wn. App. 120, 124, 834 P.2d 36 (1992). Accordingly, a trial court may grant a motion for new trial when the jury's damages award was so excessive that it unmistakably shows that the damages award must have been the result of passion or prejudice. CR 59(a)(5); *Conrad*, 119 Wn. App. at 293. Absent such passion or prejudice, the damages award must "be so excessive as to be outside the range of evidence or so great as to shock the court's conscience." *Conrad*, 119 Wn. App. at 293.

An award for pain and suffering is not susceptible to precise measurement and cannot be proven with mathematical certainty. *Stevens v. Gordon*, 118 Wn. App. 43, 59, 74 P.3d 653 (2003). In addition, an award for loss of love, care, companionship, and guidance is extremely subjective and difficult to calculate with certainty. *See Ueland v. Pengo Hydra-Pull Corp.*, 103 Wn.2d 131, 138-39, 691 P.2d 190 (1984).

Following trial, the jury returned a special verdict, finding that the Clinic failed to provide informed consent to Kathryn. The jury also awarded $16.7 million in damages, apportioning $5 million to the estate of Kathryn, $5 million to Kenneth, and $6.7 million to Jacob. The trial court entered judgment on the jury's verdict.

The Clinic filed a motion for new trial, arguing that the jury's damages award was so excessive as to unmistakably demonstrate that the award was the result of the jury's passion or prejudice. The trial court denied the Clinic's motion, stating:

> The pain and suffering of [Kathryn], well, that's, in one sense, almost impossible to know. I can't tell what [Kathryn] was feeling or wasn't feeling. . . . I don't think it's pure speculation to think that if you're having a tube inserted in your throat in the ER while you're pregnant, that you might very possibly think bad things are going [to] happen from this. . . . I, again, have no reason to think the jurors just disregarded the instructions.

VRP (Dec. 1, 2015) at 34-35.

At trial, the Flytes introduced evidence that Kathryn exclusively cared for the family home and for Jacob. A few days after visiting the Clinic, Kathryn was admitted to the hospital. Her health quickly deteriorated, and Kenneth heard her scream out as a tube was inserted in her throat so that she could breathe. Because of Kathryn's condition, doctors placed her in a medically induced coma and delivered Abbigail by emergency caesarian section. Kathryn remained in the hospital for nearly two months before she passed away. As a result, the record does not suggest that the jury was prejudiced against the Clinic or incited by passion. Because the record does not show that the damages award was the result of passion or prejudice, we must determine whether the damages award was so great as to shock our conscience or to be outside the evidence presented. *Conrad*, 119 Wn. App. at 293.

While Kathryn was unconscious for nearly two months before her death, substantial evidence was presented from which the jury could find that she suffered from conscious pain, fear for her and Abbigail's lives, and the realization that her life might be ending. Further, Kenneth and Jacob experienced the loss of love, affection, and care after Kathryn's unexpected death. Although the jury's damages award was substantial, the award does not, under the facts

23

and evidence established, shock the conscience and is not so excessive as to unmistakably show that it is the result of passion or prejudice. Because the damages award is supported by the evidence, the trial court did not abuse its discretion in denying the Clinic's motion for new trial.

IV. CROSS-APPEAL: EFFECT OF PRIOR SETTLEMENT

On cross-appeal, the Flytes argue that the trial court erred in reducing the jury's damages award by offsetting the amount of the Flytes' previous settlement with Franciscan Health Systems.[8] We agree.

We review a trial court's decision to grant an offset for abuse of discretion. *Eagle Point Condo. Owners Ass'n v. Coy*, 102 Wn. App. 697, 701, 9 P.3d 898 (2000). A trial court abuses its discretion if its decision is based on untenable grounds or untenable reasons. 102 Wn. App. at 701. A trial court's decision is based on untenable grounds when the decision rests on a misapplication of the law. *Ausler v. Ramsey*, 73 Wn. App. 231, 235, 868 P.2d 877 (1994).

Before the Tort Reform Act of 1986, concurrent and successive tortfeasors were considered jointly and severally liable in Washington. *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 291, 840 P.2d 860 (1992). "Where liability was joint and several, each tortfeasor was liable for the entire harm and the injured party could sue one or all of the tortfeasors to obtain a full recovery." 120 Wn.2d at 291. The rule of joint and several liability coincided with the common

---

[8] The Flytes request sanctions under CR 11, claiming that the Clinic's counsel provided knowing legal misrepresentations regarding the trial court's authority to enter an offset. The record does not show that the Flytes requested sanctions from the trial court. Accordingly, the Flytes may not request attorney fees for the first time on appeal. *Scott v. Goldman*, 82 Wn. App. 1, 10, 917 P.2d 131 (1996). To the extent that the Flytes are requesting attorney fees on appeal under CR 11, we have previously held that "CR 11, a superior court rule, does not explicitly authorize us to award sanctions." *Schorno v. Kannada*, 167 Wn. App. 895, 904, 276 P.3d 319 (2012). Thus, we reject the Flytes' request for sanctions.

law rule that prohibited contribution between joint tortfeasors. 120 Wn.2d at 292. However, in 1981, Washington established a right of contribution between joint tortfeasors based on their comparative fault. 120 Wn.2d at 292. "[W]here there was no joint and several liability, there was no right to contribution." 120 Wn.2d at 292. Consequently, the Tort Reform Act rejected and modified the common law rule of joint and several liability. Cornelius J. Peck, *Washington's Partial Rejection and Modification of the Common Law Rule of Joint and Several Liability*, 62 WASH. L. REV. 233, 255 (1987).

RCW 4.22.060(2) provides that a defendant is entitled to an offset of any amounts paid to the plaintiff by a settling defendant pursuant to a settlement agreement. However, a defendant is entitled to an offset of the settlement amount only when there are jointly and severally liable defendants, as defined in RCW 4.22.070. *Washburn*, 120 Wn.2d at 296.

Generally, RCW 4.22.070 abolished joint and several liability in actions where more than one defendant is at fault. *Kottler v. State*, 136 Wn.2d 437, 446, 963 P.2d 834 (1998). Joint and several liability, nevertheless, is retained in explicitly listed exceptions. RCW 4.22.070(1). Parties are jointly and severally liable when "both were acting in concert or when a person was acting as an agent or servant of the party" and when a trier of fact determines that the plaintiff was not at fault and judgment is entered against multiple parties. RCW 4.22.070(1)(a). Settling, released defendants do not have judgment entered against them within the meaning of RCW 4.22.070(1). *Washburn*, 120 Wn.2d at 294. Thus, settling, released defendants are not jointly and severally liable defendants. 120 Wn.2d at 294.

The Flytes entered into a settlement agreement with Franciscan Health Systems for $3.5 million before filing their claim against the Clinic and released Franciscan Health Systems from

further litigation. Prior to trial, the Clinic filed a motion to offset the $3.5 million settlement from any potential damages awarded to the Flytes.[9] The trial court granted the Clinic's motion to offset, determining that the offset should be imposed to avoid potential double recovery. Following the jury's verdict and award of $16.7 million in damages, the trial court reduced the Flytes' damages award by their $3.5 million settlement.

The trial court erred in granting the Clinic's motion to offset because the Clinic is not entitled to an offset under RCW 4.22.060. The Flytes entered into a settlement agreement that released Franciscan Health Systems from further litigation. At trial, the Clinic did not present evidence showing that Franciscan Health Systems was at fault or showing that Franciscan Health Systems was acting in concert with the Clinic or as its agent. As a result, the trial court did not enter judgment against Franciscan Health Systems. Accordingly, Franciscan Health Systems is not a jointly and severally liable defendant for purposes of RCW 4.22.070.

Because Franciscan Health Systems is not a jointly and severally liable defendant, RCW 4.22.060 does not apply, and the Clinic is not entitled to contribution or an offset for the Flytes' $3.5 million settlement with Franciscan Health Systems. *Washburn*, 120 Wn.2d at 294. The trial court's decision to grant the Clinic's motion to offset was based on untenable grounds because the trial court misapplied RCW 4.22.060. Thus, the trial court abused its discretion in granting the Clinic an offset. We remand to the trial court with instructions to enter judgment for the Flytes for the full amount of the verdict against the Clinic.[10]

---

[9] The Clinic neither presented an "empty chair" defense against Franciscan Health Systems nor asked the jury to apportion fault under RCW 4.22.070.

[10] In its reply brief, the Clinic argues that we must remand for a new trial to properly determine allocation under RCW 4.22.070 because the Flytes cannot receive double recovery. However,

CONCLUSION

We affirm the jury's verdict finding that the Clinic failed to provide Kathryn informed consent, but we remand to the trial court with instructions to enter judgment for the Flytes for the full amount of the verdict against the Clinic.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, P.J.

We concur:

Johanson, J.

Sutton, J.

---

the Clinic is incorrect because "it would be anomalous to give the benefit of an advantageous settlement to the nonsettling tortfeasor rather than to the plaintiff who negotiated it." *Waite v. Morisette*, 68 Wn. App. 521, 527, 843 P.2d 1121 (1993). Moreover, we note that the invited error doctrine also applies. "The invited error doctrine prohibits a party from setting up an error in the trial court then complaining of it on appeal." *In re Pers. Restraint of Tortorelli*, 149 Wn.2d 82, 94, 66 P.3d 606 (2003). Accordingly, the Clinic invited error by moving to offset the $3.5 million settlement agreement with Franciscan Health Systems.